Good morning. Gene Homan appearing on behalf of Tacoma Police Officer Hannah Heilman. I would like to reserve three minutes for rebuttal. Officer Heilman is asking this Court to reverse the District Court's denial of her motion for summary judgment on the basis of qualified immunity. The record is such that once the appropriate legal standards are applied and the relevant admissible evidence is considered, the Court could dismiss or grant the officer's motion for summary judgment on either prong of the qualified immunity analysis. Counsel, I'm going to ask you a question right up front so you know where I'm coming from, because in your briefing there are repeated references to whether or not the officer's conduct was or was not reasonable, understanding that the decedent exited his car holding a gun. That is replete in the briefing, and there's considerable physical evidence to contradict that. So what set of facts should we take as uncontested for purposes of assessing the summary judgment? To the extent the briefing was unclear, the Court has my apologies. What is uncontested is that Brooks Papineau always kept a weapon in his car in a zippered holster on the passenger side of his seat. I understand. It is uncontested that the weapon was found on the driver's seat after he exited the vehicle. And that another officer had moved it or picked it up and put it, right? Yes, got it. Okay. And plaintiff does not dispute that Brooks Papineau retrieved the weapon while in the car. Plaintiff argues that Brooks Papineau did not exit the, completely exit the vehicle with the gun still in his hand and did not point it at the officer. Plaintiff admits that Brooks Papineau on his way out of the car left the weapon in the car. What is undisputed is that the officer is sitting in her car, sees a gun in Mr. Papineau's hand. Now the district court said… Wait a minute, thinks she did, right? She saw a weapon. She is no doubt. What she wasn't clear about in her testament was… This is important, counsel. You just said it's undisputed that she saw a weapon in his hand. While he was in the vehicle. Well, so hold on. This is important. Yes. She testified that she did. She thought she did. I'm not taking her credibility into question here, certainly not on appeal. But to say it's uncontested, they contest that, right? Well, they have to have evidence to contest it, Your Honor. They had an expert. No, actually their expert said in his testimony in response to direct questioning, do you know what happened with the gun and how it got to the edge of the seat? I thought he opined that given the configuration of the cab of the pickup vehicle that Mr. Papineau was driving, and Mr. Papineau's size, that in order for him, the way she described she saw the gun when he was in the vehicle, that in his opinion would not have been possible for him to see the gun. He said it would be an unnatural and a contorted condition. So they contest that, that she could have seen a gun. She saw the weapon. But you have another problem, and that is that her description of the gun doesn't match the gun that he had. That is not a material fact. That's not a material fact? She saw a pistol, Your Honor. She saw a handgun. The fact that she misidentified the model doesn't change the fact that she saw him. But it's a pretty big discrepancy between the gun that she says that she saw and the gun that he had. It had a narrower barrel. Yeah, they're very, very different looking. So different. So different that one expert, there's a suggestion that she may have seen, just mistakenly. Again, I'm not accusing anybody of fabricating anything, but what she may have thought she saw was actually a window wiper, a windshield blade. So different that it seems to me there's a real dispute of fact about whether your client, in fact, saw any gun in his hand. Isn't that disputed? No, Your Honor. There was nothing in Mr. Sweeney's opinion that suggested. He said, Officer Heilman described seeing Mr. Papanow's arm outstretched with the weapon. Yes. Given the size of the cab and the location of the seat backs and the headrest, Mr. Sweeney opined that it would be an unnatural and contorted position. He could not say, and his testimony was clear, I pressed him carefully, Ken, is there anything about the physical evidence that would allow you to say that Mr. Papanow's hand while seated in the truck and Mr. Sweeney said no? There's nothing in the physical evidence. Counsel, it seems to me from this record that a juror, a reasonable juror, could absolutely make that finding, and I want to give you a fair chance to respond. The first point in my notes is that there was no, I think uncontested, no blood spatter on the gun. No blood spatter. Okay. The second is the point that Judge Pius raised, that the decedent's arm outstretched, it would have been a very unnatural position, right? In fact, he wouldn't have had his arm outstretched in order for the profile of the gun to be seen between the two headrests. He could have had his arm like this. And the third point is that the profile of the gun was very, very different, and so different it could have been mistaken for the windshield wiper blade. So couldn't a reasonable juror decide that he didn't have a gun at all and your client was mistaken about that? Not given the evidence in its totality. It's undisputed that Mr. Papanow had the weapon in his car. It's undisputed that it is his gun and it is registered to him. And again, plaintiff offers no evidence to say that Mr. Papanow, and in fact concedes implicitly in their briefing, that he himself retrieved the weapon from the zippered holster on the passenger seat. Plaintiff only argues that he didn't have it in his hand when he fully emerged from the car. The detective who was in charge of this case, and as plaintiff said in their appellate briefing, their expert, and I dispute that, their expert actually didn't offer this as an opinion, but the detective in charge of the investigation concluded that as Mr. Papanow was exiting in one fluid motion,  The district court denied qualified immunity by applying, frankly, the wrong legal standard. First it said, on the first prong of the analysis, whether or not the plaintiff was able to make a prima facie case of a constitutional violation, the court said a jury could conclude she was mistaken. A jury could conclude that. That's not the question. The question is whether it was objectively reasonable for her to conclude that he presented a threat of death. That's exactly what he's saying. He's saying if you take the facts in the light most favorable to the plaintiff, The non-moving party. The non-moving party, I guess is what we should say. It's the non-moving party here. And on qualified immunity, when you get to qualified immunity, you have to, if there's any conflict, You have to take the facts. You have to take the facts for the plaintiff. Right, but And when you do that, the district court said a reasonable trier fact could conclude that he didn't have a gun in his hand when he exited the vehicle. But the law allows an officer to have a mistaken but reasonable belief that they's armed. Absolutely, counsel, but that's really different than what you started with at the top of your analysis and really different than the briefing, where you're telling us, and I'm not trying to beat you up on this, but this is an important point. So if we're missing something, I want to know about it. I know this case is very, very important, but what you're trying to argue initially is that it's uncontested that he had a gun in his hand. And it seems to me that's absolutely contested. Your Honor, I respectfully disagree. The evidence in the record, there is literally no evidence to, other than Kay Sweeney's opinion that holding his arm straight out would be an unnatural and contorted position. There is nothing to rebut the officer's assertion. And the officer is mindful of the fact that when you have a deadly force encounter where one of the two people involved is dead, you have to parse through the record very, very carefully. You cannot just simply take the officer's assertion. Well, there's another undisputed fact, which is when they found the body, the gun was inside the cab. It was inside the cab. A reasonable inference of that is that he didn't have the gun in his hand as he was exiting. But it was also an eyewitness to this. And there's also an eyewitness to this event who testified that he saw the car doors open simultaneously, saw both of the occupants leave their vehicles, saw Mr. Papanow facing the officer with the dark object in his hand and his hand outstretched, and the eyewitness said, I thought it was a gun. Again, the law allows an officer to be mistaken about the level of force required if the belief is reasonable. And there is no question. It is the officer believed Mr. Papanow had the gun outside of the vehicle. The evidence is such that that's probably not accurate. Let me ask you another question. If the officer was mistaken and he didn't have the gun outside, you're not arguing he ever had the gun outside the truck, are you? No. All right. So let's just pick up at that point. Your client responded by, I think, becoming convinced that she was going to die, that her life was in danger. Yes. All right. And what I don't understand is it seems a little funny in the briefing, that she exited her vehicle and wanted to scramble to get to the back of her to take cover, basically, as quickly as she could, but that she also immediately opened fire. She didn't warn him first. Warnings are required if feasible, Your Honor. I know that. And my question is, so forgive me, but your time's ticking. When she exited the police vehicle, did she turn her back and run to the back of her car, or did she come out sideways and sort of shoot backing up? She shot backing up. Okay. So thank you for that clarification. And now, if you could, in that order, could you explain to me why a warning was not feasible? Because she had no question in her mind that she had seen a handgun in his hand while he's seated inside the truck. Had Mr. Papanow retrieved a weapon and simply sat in his truck, an application of deadly force would not be justified. It wouldn't be warranted. It was the act of seeing a gun while he is in direct disobedience of her orders, opening the car door and exiting. And as he's exiting, she's watching the gun come down and out of sight. She has no reason to believe that he's going to leave that gun behind. Okay. Counsel, how many? There were two sort of volleys of shots fired. How many in the first volley? I believe three. Okay. And she stopped? She got to the back of her car, popped up, saw him standing. His hands were down. She could not see them. Okay. And so at that point, did anything else happen before she started shooting again? No. She fired two more shots and they, according to the eyewitness, were in rapid succession with the first three. There was no substantive break in time. Okay. And then she gave a verbal warning? She moved to the far, the passenger side of her trunk, popped up, sighted him. He was still there. At that point, the eyewitness had pulled off onto the side of the road in front of Mr. Papanow's vehicle, which put him in the officer's backdrop. And then she started drop the gun, drop the gun, and then Mr. Papanow fell to the ground. All right. Thank you. Did you want to save some time for rebuttal? I do, Your Honor. Thank you. Thank you. If it pleases the Court, my name is Tim Ford. I represent Judy Papanow, the widow of Brooks Papanow, and his personal representative. Brooks Papanow, of course, is not here to tell us his version of the events, and this Court has said several times that it's very important in that kind of a situation to look with particular scrutiny at what the evidence that the police officers are bringing forward is. And almost everything you've heard today is just the version of Officer Heilman about what happened. And the only undisputed facts in this case are that Brooks Papanow did have a gun in his cab at some point. It was his gun. And second, that he was shot. Well, he also had something in his hand as he exited the vehicle. Well, I don't think so, and it's actually impossible. Didn't they find a wallet on the ground? Keys in a wallet. He had keys in a wallet. It's uncontested. He had a wallet in his hand. That's correct. Right, that's what I mean. So why could an officer standing back, well, not standing, but in the vehicle, I don't know how many feet they were separated. He's right behind you. That night, you know, as he's coming out of the vehicle, she sees something in his hand. But remember, she says right hand. And remember, if you are Officer Heilman, I am Brooks, I'm coming out of the car, my right hand is here. You can't see my right hand. But, counsel, that's why you think she's wrong. And, of course, when we do a qualified immunity analysis, when we do a qualified immunity analysis, the question is whether the officer was unreasonable. So if we talk about sort of the prototypical case in this area where a police officer makes an incorrect, a tragically wrong call, judgment call in the field in a split second and thinks that a cell phone is a gun, we've all read those cases, typically, or often in those cases, qualified immunity is granted. So could you address that, please? Well, I don't think qualified immunity is granted if the officer, if a jury could find that the officer's belief was unreasonable. That's exactly it. The factual belief was unreasonable. That's exactly it. So she was alone and it was late. And you know all the facts, I'm sure, very, very well. So could you just address that? That's the intersection, whether she's wrong. And you have a lot of physical evidence that indicates to me that she was wrong. Why was she unreasonable? I think it's unreasonable to be wrong when you are saying, I saw something. I saw the gun in his hand as he was exiting. That's impossible. I saw the gun pointing at me. That's impossible. That's demanding perfection. That's demanding perfection. That's black-letter law. She gets to be wrong. She can't be unreasonable. Well, but for a jury, remember, a jury could say, this officer has said several things that are untrue. She's said things that are inconsistent with herself. She's said things that are inconsistent with the physical evidence. She's said things, we have circumstantial evidence, that she's said things such as that Brooks was actually shooting at her that ultimately were proved not to be true and she's changed her story. That jury could say, we don't believe this officer at all. That's a different argument. That's the argument that she may have found to be actually misrepresenting the facts. Okay. I'll grant you that there's that argument, but there's a middle road there that I'm trying to get you to address, sir, and that is there's something between being right and misrepresenting, and that is what if they decide that they think she's a credible witness and she thought she saw a gun, right? What about that would have been unreasonable under these circumstances? Well, if she explained to the jury all the facts that led her to believe she saw a gun and they found that was reasonable, I mean, that's a classic jury question. Is a belief about a physical event that you can see, not a legal question, but a physical event, is it a reasonable belief? And she said things that are physically impossible, and once the jury, I think, hears that, they would think perhaps her belief wasn't reasonable. What if she panicked? Pardon me? Forgive me. I didn't mean to interrupt you, sir. What if she panicked? What if she panicked? And that's the deep question in this case could become that. Is panic reasonable? Is that really the standard by which our rights can be taken away because a government official panics and believes something that's totally false and perhaps even irrational and perhaps even says things that are untrue? Well, police officers are human beings, and so I guess my question is, do you have case law authority that really goes to that question about a police officer making an incorrect call out of fear or panic? I don't think that there are cases that address that specific thing, and I don't think it's necessary for this court to address that specific thing because of the large number of facts that she got, at least our evidence would show, completely provably wrong, the inconsistencies in her statement, and ultimately the question I think that Your Honor alluded to. Even by her testimony, she saw Brooks standing there with his hands by his side, and she shot him twice, indeed shot the fatal shot, we believe, according to our medical evidence, after she saw him standing with his hands by his side. And this court held in the George case and has held in a number of cases that simply having a firearm, even if she believed he still had a firearm, even if that was a reasonable belief she still had a firearm, and we believe it's not a reasonable belief, in fact it's a falsehood, she still can't shoot him then without warning when he's just standing there? Does the evidence show that he was shot as he was exiting the vehicle, or was he completely out of the vehicle when the first volley was fired? The circumstantial evidence indicates that the first shot that hit him was when the door was only partially open, based on the trajectory of the bullet in his leg and into the door of the vehicle. She started shooting even before he got out of the vehicle at all, when she could not possibly have seen a gun in his right hand, which is what she says, both with regard to what she saw when he was inside the truck and what she says she saw afterwards. Both of those things are impossible for her to have seen, there's no way. It's inconsistent with the physical evidence. So the evidence seems to suggest that as he was exiting the vehicle... She started shooting. She said she got out of the car as fast as she could and started shooting as fast as she could. And I think a jury could easily find, and I think what we will argue happened in this case, is she realized that she'd put herself in a bad position because she had made a stop under unusual circumstances and hadn't taken the ordinary precautions, and this man was now getting out of the car, and it was late at night, and she thought she was going to die, and she got out of the car and simply started shooting without saying what she was shooting at. And then she started making up stories, either in her own mind or in order to justify her actions to other police officers. Ordinary precautions. She told him to stay in the car. She shut his door. She didn't take his keys. She didn't take his keys. She didn't search him. She didn't handcuff him. She didn't do any of the things that could have been done and would have ordinarily been done in a circumstance that involved a danger because there wasn't a danger. His keys wouldn't have kept him in the car. He got out of the car with keys in the wallet. He didn't try to drive away. But he could have driven, but that would be an ordinary thing to do. It's not usual practice on a DUI to take somebody out of the car and handcuff them. I think under these circumstances where it's a solo officer out of jurisdiction... There's a lot of that. I'm certainly not a police expert in any way, but you stop and think about it. They usually tell you to stay in the car. They usually also say put your hands on the wheel where we can see them. And I'm not arguing that her actions were unreasonable because they weren't good police procedure. What I'm arguing is that she acted unreasonably because she realized she'd not followed good police procedure and she perceived a danger that simply wasn't there. Opposing counsel said your, I think, said that your position is that it's uncontested that the decedent picked up his gun from underneath the blanket. That's not true. That's her testimony. As your Honor's pointed out, there's two facts. The physical evidence does not show it. Both Officer Sweeney's evaluation of the physical limits of the cab in which she claims she saw this and also the description of what she said the gun was, which was a four or five inch thin barrel, which is completely not what this is at all. It's much more like a windshield wiper. That's not my question. My question is a little more specific, please. My question really goes to the fact that the gun was found on the driver's seat and I understand that another police officer said he picked it up and so what was actually discovered is not where the decedent would have left it. But my question is quite specific. I think the record is very clear. It was the decedent's gun, that he kept it in the car, that he kept it under this blanket. Right? So my question is forget whether he picked it up and made any gesture with it. Is it uncontested that he picked it up and moved it out from under the blanket at all? No. We don't know. The only evidence we have is Officer Heilman's testimony that she didn't move it and then Officer Tiffany's testimony or Officer Burke's testimony, I'm sorry, that he, in fact, did move it in violation of police procedures. And these are situations where a jury could say, we simply aren't going to believe anything except what we can see with our own evidence because there is clearly indications here, unusually strong indications, in my experience of doing a lot of these cases, of police testimony not being consistent and being inconsistent with physical facts in ways that are very concerning. And I think a jury should hear to make these determinations. Unless the Court has other questions, I'd point out that this case has been here for two years since the final briefing was done. This is an example of how these interlocutory appeals are an extraordinary burden on the rights of people to have juries make these determinations of whether officers' actions were proper, whether officers are telling the truth, and whether the Constitution was violated. I would ask that the Court affirm Judge Layton's ruling and let us have a trial on this case. Thank you. Thank you very much, Counsel. I believe there was some time for rebuttal. Thank you, Your Honor. Let me start with what Counsel just said. Heilman said several things that are untrue, like he shot at her. There is no competent evidence in the record that Officer Heilman ever said Mr. Papanow shot at her. That's the hearsay issue. It was rank on its face and the district court should have ignored it. With respect to the inconsistencies among the officers' statements, Counsel is misapplying that standard. The Court looks to inconsistencies among the officers' statements who were present at the time of the shooting. The clearest example I could find of this was an opinion issued by this Court approximately two weeks ago in C.V. v. City of Anaheim, where there's an issue about whether or not the decedent actually picked up the shotgun and pointed it in the direction of the officers. Some officers said yes, officers who were present at the time. Some officers said no, officers who were present at the time. In this case, the statements that have been deemed, quote, inconsistent are attributable to investigators of another agency who weren't present at the time of the shooting. Doesn't it create a problem that we need to figure out how these other officers created that impression? No, they played telephone. If you read Detective Murad's testimony, he said, Well, I talked to Detective Jimenez. We have no idea how Detective Jimenez got that information. You read Officer Burke's testimony. He said, I talked to Heilman. Did anybody ask Jimenez? No. And, again, level upon level upon level of hearsay, it is not indicative of Officer Heilman making inconsistent statements. Did the other officers just made up stuff? They screwed it up. They messed it up. They made the mistakes, and they messed it up. And the district court is particularly egregious, the plaintiff continues to argue, when they know that Officer Tiffany, who this statement is attributed to, has disavowed it under oath. And that's in the record. Murad says, Tiffany said, Heilman said. Tiffany said, I didn't say that, and neither did she. So the district court was concerned that there might be some attempt, I hate to use the words, but I think the district court did, was cover up. The district court noted that Officer Heilman's current account was consistent with both her report and all of her statements. The inconsistencies came from investigators who had no firsthand knowledge. Could you please turn off the cell phone? And if anybody else has a cell phone in the courtroom, please turn it off. Also, with respect to the panic, that's a subjective standard. Both the use of force analysis and qualified immunity requires an objective standard, not whether this individual officer panicked, but whether objectively it was unreasonable under the circumstances. And that leads us to clearly establish, because that is the essence of qualified immunity, was the law so clearly established at the time of the incident such that this officer would have known, any reasonable officer would have known, beyond a doubt, that their conduct was unconstitutional. The district court didn't even undertake that analysis. And the only case identified by the plaintiff in this case is Curnow, which is completely in opposite. The facts in that case were completely in opposite to the instant case. The Supreme Court has made it clear, qualified immunity on the clearly established law prong has to be defined at a level of specificity that is relevant to the case. So in this case, the question on qualified immunity becomes, was the law sufficiently established at the time of this incident such that a reasonable officer who mistakenly believed that a suspect had a weapon in his hand and exited the car and pointed it at her, and in fact the object turned out to be a wallet, would have known under those circumstances that her actions were unreasonable, constitutionally infirm. No case law has been identified. And Mr. Ford just conceded he didn't believe there were any cases dealing with an application of deadly force out of a fear when the officer had a mistaken belief about whether or not the suspect was armed. But it is that . . . you've just put your finger on something that's quite different and separates this case from many, many, many reported opinions, and that is there's a real question about what the circumstances were that actually confronted this officer. Your Honor, in Cunningham, on interlocutory review, this court said, yep, the allegation is that these officers fabricated evidence, but you know what? There's literally no evidence in the record that these officers fabricated anything. There is no evidence in this record, zero, that anybody other than Brooks Papineau retrieved that gun from the zippered pouch under the blanket on the passenger seat. The eyewitness was present on the scene from the moment the suspect and the officer exited their vehicle and stayed there until other officers arrived and medical aid was present. He didn't talk about seeing officers rummaging through Mr. Papineau's car. The allegation is that the officer discharged her weapon in fear, then searched his vehicle, got lucky enough to find a weapon hidden in a zippered pouch under a blanket on the passenger seat that happened to be registered to Mr. Papineau and retrieved it in order to justify what was an unjustified shooting and then left it on the seat. There's zero evidence of that. An officer did take the gun and empty it. Officer Burks picked up the gun. He mishandled it. Officer Burks is with the Pierce County Sheriff's Department. They were the investigative agency, and he responded as backup. That is not attributable to Officer Heilman. And Burks and Heilman's testimony is consistent with respect to where the gun was found at the time of the incident prior to Burks handling it. You've gone over your time. I've let you go over your time. I appreciate your time this morning. Thank you. Thank you. Thank you. Yeah. Ladies and gentlemen, we're going to take a 10-minute recess.
judges: Paez, Bybee, Christen